UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 MAY 21   PM 12: 56

CLERK

BY_____

DEPUTY CLERK

UNITED STATES OF AMERICA      )

                                  )

v.                             )     Case No. 5:14-cr-32-1

                                  )

PATRICIA MERZ                 )

## OPINION AND ORDER DENYING DEFENDANT'S MOTIONS FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL
(Doc. 81)

Pending before the court are Defendant Patricia Merz's motions for a judgment of acquittal and for a new trial (Doc. 81). In her motions, Defendant challenges both the sufficiency of the evidence and the legal theories upon which the government prevailed at trial. On April 8, 2015, the court held oral argument and took the pending motions under advisement.

The government charged Defendant in a four count Superseding Indictment with: knowingly and willfully conspiring to commit the crime of interstate transportation of stolen money, in violation of 18 U.S.C. § 371 (Count I); transmitting and transferring in interstate commerce stolen money, in violation of 18 U.S.C. § 2314 (Count II); causing sums of money to be transmitted by wire in interstate commerce, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme, in violation of 18 U.S.C. § 1343 (Count III); and uttering a forged security with the intent to deceive another person or organization, in violation of 18 U.S.C. § 513 (Count IV).

The case arises out of the administration of the probate estate of Defendant's mother Annelise McGuigan (the "Estate") by Defendant and her brother, Christopher McGuigan. Mr. McGuigan was indicted as a co-conspirator, entered a guilty plea, and testified against Defendant at trial pursuant to a cooperation agreement with the

government. After a four-day trial, the jury found Defendant guilty of all four counts of the Superseding Indictment.

The government is represented by Assistant United States Attorney Gregory L. Waples and Assistant United States Attorney Nikolas P. Kerest. Defendant is represented by Federal Public Defender Michael L. Desautels.

## I.      Factual and Procedural Background.

The government's evidence at trial consisted of the testimony of eleven witnesses and fourteen exhibits. Defendant introduced ten exhibits into evidence, testified on her own behalf, and called two additional witnesses. Many of the relevant facts were uncontested.

In August 2009, Annelise McGuigan died at a residential care facility in Bennington, Vermont without leaving a will. Her principal asset at the time was her former residence in Rupert, Vermont (the "Rupert House") where Christopher McGuigan was living. Defendant and her brother were their mother's sole heirs.

In December 2009, the Bennington County Probate Court (the "Probate Court") granted Defendant's and Mr. McGuigan's request to serve as co-administrators of the Estate. The evidence revealed that Defendant was informed of and understood her duties and responsibilities as a co-administrator and signed a bond that stated as follows:

> We Patricia C Merz of Granville N.Y. as principal and co
> signer Chris McGuigan as sureties, are held and stand bound to the
> Probate Court for the District of Bennington in the penal sum of
> $210,000.00 to secure performance of duties as fiduciary as
> specified in the conditions below.
>
> The conditions of this obligation are that Patricia C. Merz
> who is administrator of the estate of the deceased shall:
>
> 1.      Make and return to the Probate Court within thirty days of
> issuance of Letters Testamentary/Letters of Administration a true
> and perfect inventory of goods, chattels, rights, credits and estate of
> the deceased, which shall come to his/her possession or knowledge
> or to the possession of any other person for him/her;

2

2.     Administer according to law, if an executor, according to the will of the testator, all goods, chattels, rights, credits and estate which shall at any time come to his/her possession, or to the possession of any other person for him/her, and of the same, pay and discharge all debts, legacies and charges on same, or such dividends thereon as shall be decreed by the Probate Court;

3.     Render a true and just account of his administration to the Probate Court within one year and annually thereafter, and at any time when required by this court;

4.     Pay all taxes which the executor or administrator is required to pay; and

5.     Perform all orders and decrees of the Probate Court.

When the conditions of this obligation are fulfilled, the bond shall no longer be in force.

(Gov. ex. 3 at 1744.)

Defendant testified that when she signed the bond, she intended to follow the rules and regulations of being an administrator. She also testified that she received a copy of the Probate Court's informational booklet for pro se parties (Gov. ex. 13) which explained an administrator's duties and responsibilities in some detail. She acknowledged that she was aware that her obligations as an administrator included paying the creditors of the Estate.

Edgar Campbell, Esq. testified on behalf of the government to explain the obligations of an administrator and the nature of a probate estate. Attorney Campbell has practiced law in Manchester, Vermont since 1978 and specializes in estate planning. He assumed responsibility for administering the Estate when Defendant and her brother were removed as co-administrators by the Probate Court.

Attorney Campbell testified that a probate estate is a legal entity created under Vermont law in order to administer and distribute the assets and pay the debts of a deceased person. He explained that, as a legal entity, a probate estate is subject to federal and state taxation, could sue and be sued, and could engage in financial transactions such

3

as buying, selling, and investing subject to the constraints of probate law. He explained the duties, rights and responsibilities of an administrator of a probate estate which included paying the undisputed claims of an estate's creditors before distributing all of the estate's assets to the heirs. He described Defendant's and her brother's failure to fulfill their obligations to the Estate and how and why they were removed as administrators.

The evidence further revealed that in June 2010, Defendant and her brother published a notice to creditors of the Estate which stated in relevant part: "All creditors having claims against the estate must present their claim in writing within four months of the first publication of this notice. The claim must be presented to me at the address listed below with a copy filed with the register of the Probate Court." (Gov. ex. 3 at 1720.) Five creditors filed claims including a funeral home which provided burial services for Annelise McGuigan, a landscaping business which had provided services to maintain the grounds surrounding the Rupert House, a credit card company, the State of Vermont, and the residential care facility which cared for Ms. McGuigan before her death. The State of Vermont filed the largest claim, for $71,016.47, for Medicaid expenses that it paid for the care Ms. McGuigan received at the residential care facility. A representative of the State of Vermont testified that she mailed a copy of this claim to Defendant and Mr. McGuigan in January 2010 and again in May 2010.

In July 2010, Defendant and her brother applied to the Probate Court for a License to Sell Real Estate (the "License") to sell the Rupert House.[1] In their inventory of the Estate, Defendant and her brother stated under oath that the Rupert House was "the property of the estate." *Id.* at 1722. In their motion seeking a license to sell, they stated that the sale would benefit the Estate because "it would liquidate the sole asset of the estate and allow the asset to be liquidated, distributed and the Estate be closed." *Id.* at 1715. The Probate Court issued the license on August 4, 2010 and in doing so identified

---

[1] The License provided in relevant part that "the Court does order and decree that the real estate described above may be sold and the Court licenses, authorizes, and empowers you, the Executor of the estate of the deceased, to sell the real estate either at public auction or private sale." *Id.* at 1651.

4

the Rupert House as "the sole asset of the estate." *Id.* at 1650. The License directed
Defendant and her brother to file a written report of the sale with the Probate Court.

Upon receipt of a $10,000.00 deposit for the sale of the Rupert House, Defendant
and Mr. McGuigan opened a checking account at TD Bank in Vermont in the name of
"Estate of Annelise McGuigan Patricia C Merz Coadministrator and Christopher
McGuigan Coadministrator" (the "Estate account"). (Gov. ex. 1 at 223.) Defendant and
her brother were identified on the account not as owners or account holders, but as co-
administrators.

Christopher McGuigan testified that he and Defendant agreed that he should
maintain possession of the Estate's checkbook. Defendant, in contrast, suggested that her
brother insisted on keeping the checkbook and she testified that because he was an
alcoholic and she was afraid of him when he was drinking she acquiesced to this request.

Defendant and her brother hired an attorney to oversee the sale of the Rupert
House. Both the disbursement statement and the HUD-1 Settlement Statement for the
closing identified the seller as the "Estate of Annelise McGuigan." (Gov. ex. 3 at 1671.)
The evidence revealed that a mechanic's lien, a mortgage, a broker's commission, and
attorney's fees were all paid as part of the closing on the Rupert House. The remaining
proceeds were disbursed to Defendant and her brother in a check for $149,930.96 and
later two equal checks for $9,975.00. Defendant's check for $9,975.00 was made out to
"Patricia Merz, executor." (Gov. ex. 7 at 1296.) Attorney Campbell described the
proceeds of the sale of the Rupert House as "an asset of the estate." (Doc. 70 at 75:7.)
He testified that had he handled the sale of the Rupert House, he would have made the
check payable to the Estate.

After the closing, on August 18, 2010, Defendant and Mr. McGuigan deposited
approximately $149,930.96 of the proceeds of the sale of the Rupert House into the
Estate account. Thereafter, both Defendant and her brother made withdrawals from the
Estate account. Mr. McGuigan testified that their agreement was that each would receive
approximately the same amount of the Estate's assets:

5

**Assistant United States Attorney**: Was there any kind of understanding between you and your sister as to what would happen if someone took money out of the estate account or received money from the estate account?

**Mr. McGuigan**: We were going to keep it fair.

**Assistant United States Attorney**: Meaning?

**Mr. McGuigan**: If—if I took a hundred dollars, she would take a hundred dollars. If I took a thousand dollars, she would take a thousand dollars. We were trying to keep it even.

(Doc. 71 at 79:8-79:17.)

If Defendant wanted money from the Estate, she would ask her brother for a check. In exchange, Defendant would sign blank checks that her brother could use at a later time. At some point, Defendant deviated from this practice and began to access the Estate account directly, without advising her brother or obtaining his signature. Representatives from the TD Bank branch in Granville, New York testified that they allowed Defendant to withdraw funds from the Estate account if she presented a withdrawal slip signed by both herself and her brother which was referred to at trial as an "accommodation withdrawal slip." A TD Bank representative described this as "like a generic form a customer would ask for if they wanted to take money out of their account." (Doc. 70 at 184:8-184:10.) TD Bank also permitted the use of "checking withdrawal slips" which served the same purpose. *Id.* at 264:6-264:7.

Government witnesses testified that they analyzed Defendant's records at TD Bank in New York and the Estate account in Vermont and concluded that Defendant had used the withdrawal slips to transfer monies interstate. The government introduced evidence of electronic transfers of funds from Defendant's personal account in New York to vendors in Vermont involving funds she accessed from the Estate account.

The evidence further revealed that when Defendant used TD Bank's drive-up teller service in Granville, she would obtain a withdrawal slip from the teller, and she would then return the slip to the teller with her brother's forged signature. She concedes that by forging his signature, she intended to deceive her brother. *See* Doc. 72 at 75:14-

6

75:17. Defendant further admitted that, while accessing funds from the Estate, she "knew there was a Shea Funeral Home bill, a Palmer Landscaping bill, and a Citi Corporation bill. And of course the Bennington Health and Rehab Center." *Id.* at 31:12-31:14.

In approximately July 2011, Mr. McGuigan discovered that Defendant had accessed the Estate account without his knowledge when he was advised by TD Bank that the Estate account held insufficient funds. He confronted Defendant and the two became estranged. Mr. McGuigan testified that both he and Defendant knew that they were required to pay the Estate's creditors before the Estate's funds were depleted and he acknowledged that none of the Estate's creditors received any payments toward their undisputed claims. Defendant did not dispute these facts but, instead, offered her own testimony to explain why she believed the Estate's creditors would eventually be paid.

Defendant testified that, at the time of the offenses, she was under significant stress because she was caring for her troubled granddaughter, who lived with her and for whom she sought to obtain custody. When her granddaughter made certain threats at her school, Defendant became embroiled in a dispute with the school and in court proceedings which occupied her time and attention. In an affidavit she submitted to a New York family court, she admitted that she was living off her inheritance. Defendant points to this statement as evidence that she did nothing to conceal her expenditures of Estate funds and as evidence that she believed she was spending her own money.

Defendant further testified that she believed the Estate's creditors would eventually be paid because she intended to file a lawsuit against the residential care facility that cared for her mother prior to her death. She testified that she believed the facility was negligent in her mother's care and caused her death by not adequately treating an infection her mother developed while recovering there. Defendant testified that she believed that the debts associated with her mother's care would be paid from the proceeds of the lawsuit. She nonetheless conceded that in June 2011, she learned that the attorney reviewing the case would not pursue it because it was uncontested that Christopher McGuigan had diverted his mother's Social Security checks for his own use, rather than using them to pay for their mother's care at the residential care facility. This

7

fact apparently rendered the negligence claim unsympathetic. The government introduced evidence that Defendant continued to expend Estate funds after she knew that the only attorney she had consulted regarding a potential lawsuit had declined to take the case.

At trial, Defendant moved for a directed verdict at the close of the government's case-in-chief and at the close of the evidence. Both motions were denied. The court held a charge conference at which the court addressed, among other things, Defendant's contention that the Estate did not "own" the funds at issue and that therefore they could not be "stolen." The court also addressed Defendant's contention that the accommodation withdrawal slips were not "securities" as defined in 18 U.S.C. § 513(c).

The court declined Defendant's request for a jury instruction that "without more, a probate estate is not an owner or the owner of the property involved in the probate process." (Doc. 41 at 22.) The court, instead, instructed the jury that the government was required to prove beyond a reasonable doubt that "the property must have been taken from someone who owns the property, who had the attributes of an owner, that is, someone who has property interests that are tantamount to ownership[,]" (Doc. 75 at 88:19-88:22), and that "as a matter of law, creditors do not own property in which they seek to recover debts. *Id.* at 88:23-88:24.

The court also declined Defendant's request to instruct the jury that, as a matter of law, the accommodation withdrawal slips were not a "security" under 18 U.S.C. § 513(c). The court, however, permitted Defendant to make this argument to the jury.

## II.    Conclusions of Law and Analysis.

### A.    Defendant's Motion for a Judgment of Acquittal.

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). "[A] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so

8

meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted).

The test for sufficiency of the evidence is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotation marks omitted). "In challenging the sufficiency of the evidence, the defendant faces an uphill battle, and bears a very heavy burden[.]" *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013).

The court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) *cert. denied sub nom. Hakimi v. United States*, 135 S. Ct. 122 (2014) (internal quotation marks omitted). It must also "resolve all . . . issues of credibility in favor of the verdict." *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000) (internal quotation marks omitted). "A Rule 29 motion 'does not provide the trial court . . . with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Anderson*, 747 F.3d 51, 59-60 (2d Cir. 2014) (internal quotation marks omitted). As a result, a conviction must stand if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mi Sun Cho*, 713 F.3d at 720 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

### B.   Defendant's Challenge to the Estate's Ownership of the Funds.

Defendant seeks a judgment of acquittal, arguing that the Estate did not "own" any money because, under Vermont law, title to her mother's assets passed directly to her and her brother upon their mother's death. She contends that the court erred in failing to give this instruction to the jury. She cites *Lysak v. Grull*, 812 A.2d 840, 843 (Vt. 2002), for the proposition that title to property vests immediately in a deceased person's heirs. In *Lysak*, the Vermont Supreme Court held:

> Legal title to real property vests immediately at death in the heirs, subject
> only to liens and legally enforceable debts of the estate. At the time of

9

> death, the heir has a possibility coupled with a vested interest, a property right which the heir can sell or assign. However, until such time as the estate is probated, and the debts of the estate are settled, the heir cannot demand either title to or possession of the property.

*Id.* (citations omitted). Under *Lysak*, an heir's title is subject to the "legally enforceable debts of the estate" and an heir does not have full ownership rights until the estate has been probated *Id. Lysak* therefore provides no support for a conclusion that Annelise McGuigan's assets were "owned" by Defendant and her brother upon Ms. McGuigan's decease.

Defendant is similarly mistaken in claiming that, under Vermont law, an estate cannot "own" property.[2]  Vermont law not only provides that an estate may "own" property,[3] but also criminalizes theft from an estate by an administrator. *See* 13 V.S.A. § 2534 ("An executor or administrator who embezzles or fraudulently converts to his or her own use, money, obligations, securities or other effects or property belonging to the estate of which he or she is executor or administrator, shall be guilty of larceny[.]"). Moreover, formal ownership is not required under 18 U.S.C. § 2314. *See*

---

[2] Defendant's reliance on *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978), is misplaced. In *Long Cove Seafood*, the Second Circuit held that "18 U.S.C. [§] 2314, does not apply to interstate transportation of clams harvested in violation of state law." *Id.* at 161. The court observed that "[a]s a general rule, wild fish, birds and animals are owned by no one. Property rights in them are obtained by reducing them to possession." *Id.* at 163. The Second Circuit thus concluded that the clams at issue could not have been "stolen" because it was "clear that no owner has been deprived of any rights or benefits of ownership, for it was the owner who took the clams." *Id.* at 164. In contrast, under Vermont law, a probate estate can both own assets and have those assets stolen from it.

[3] *See, e.g.*, *Starr Farm Beach Campowners Ass'n, Inc. v. Boylan*, 811 A.2d 155, 157 (Vt. 2002) ("The Trust Estate . . ., a perpetual charitable trust, owns the lots and all common areas at [the property.]"); *Town of Randolph v. Estate of White*, 693 A.2d 694, 695 n.2 (Vt. 1997) ("An adjoining thirty-seven-acre parcel is owned by the estate[.]"); *Knight v. Hescock*, 404 A.2d 107, 109 (Vt. 1979) (Hill, J. dissenting) ("The court . . . entered an order declaring that '(t)he subject premises are owned by the Estate[.]'"); *Town of Salisbury v. Button*, 121 A. 435, 437 (Vt. 1923) ("The listers were again notified that it was claimed that the personal property owned by the estate was not taxable, being exempt under the laws of the state."); *Cummings v. Brock*, 56 Vt. 308, 310 (1883) ("[T]he fence he built was upon the line dividing the lands of the plaintiff and land owned by [the] estate[.]").

*United States v. Hull*, 437 F.2d 1, 5 (5th Cir. 1971) (rejecting a defendant's argument "that formal proof of ownership . . . is an essential element"); *see also Long Cove Seafood*, 582 F.2d at 163 (noting that the term "stolen" "does not mean that the victim must be shown to have had good title").

The government introduced several exhibits which confirmed Defendant's understanding that the Estate owned both the Rupert House and the proceeds of its sale. For example, Defendant's application for a license to sell the property identified the Rupert House as the sole asset of the Estate, and the closing documents identified the Estate as the Rupert House's "seller." Although Defendant is correct that Attorney Campbell stopped short of testifying that the Estate "owned" the sale proceeds in question, his testimony that the proceeds of the sale of the Rupert House were "an asset of the Estate" was sufficient to support the jury's conclusion that the Estate "owned" those funds.

For the foregoing reasons, Defendant's motion for a judgment of acquittal on the basis that the court erred in failing to instruct the jury that the Estate could not, as a matter of law, own the funds in question and the sufficiency of evidence to establish that ownership is DENIED.

### C.   Sufficiency of the Evidence of Conspiracy (Count I).

The jury found Defendant guilty of violating 18 U.S.C. § 371 which provides that: "[i]f two or more persons conspire . . . to commit any offense against the United States . . ., and one or more of such persons do any act to effect the object of the conspiracy, each" is guilty of an offense against the United States.

> [T]he three elements of conspiracy under federal law . . . are: (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy.

*United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002). Defendant challenges the first and third elements, arguing that she and her brother did not reach an agreement to

commit an unlawful act and that the overt acts set forth in the Superseding Indictment were not committed in furtherance of the alleged conspiracy.

"When a defendant challenges the sufficiency of the evidence in a conspiracy case, deference to the jury's findings is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal quotation marks and alterations omitted). "[B]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *United States v. Wexler*, 522 F.3d 194, 208 (2d Cir. 2008) (internal quotation marks omitted).

Christopher McGuigan testified that he and Defendant reached an agreement that they "were going to keep it fair" and "keep it even" meaning that they would each withdraw the same amount of money from the Estate's account. (Doc. 71 at 79:12, 79:16-79:17.) The evidence corroborated his testimony by revealing that, on more than one occasion, Defendant and Mr. McGuigan jointly accessed the Estate's funds, assisted each other's efforts to access funds in the Estate's account by co-signing checks, and received from the Estate equal amounts.

Mr. McGuigan further testified that although he and his sister were both aware of their obligation to pay the Estate's creditors, they took no steps to do so. Instead, after setting up the Estate account and selling the Rupert House—both overt acts alleged in the Superseding Indictment—they spent all of the Estate's funds for their respective personal needs. Based on this evidence, a rational jury could have found beyond a reasonable doubt that Defendant and her brother knowingly and willfully entered into an agreement to deplete the Estate's funds without paying the Estate's creditors and that one or more of the overt acts alleged in the Superseding Indictment was committed in furtherance of this agreement. The jury was free to reject Defendant's argument that any such agreement was either not unlawful, or she did not know it was unlawful, as this assertion required a credibility determination and conflicted with the evidence presented by the government.

Examining the evidence in the light most favorable to the verdict, the court concludes that the government satisfied its burden to establish beyond a reasonable doubt each element of the charged conspiracy. Defendant's motion for a judgment of acquittal with regard to Count I is therefore DENIED.

### D.     Sufficiency of the Evidence of Interstate Transportation of Stolen Money (Count II).

The jury found Defendant guilty of the interstate transportation of stolen money in violation of 18 U.S.C. § 2314 which provides:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

The essential elements of a violation of 18 U.S.C. § 2314 are:

> (i) that the goods, wares, merchandise, securities or money were stolen or converted; (ii) that the defendant transported, transmitted or transferred the property in interstate or foreign commerce; (iii) that at the time of the transportation or transmission, the defendant knew the property was stolen or converted; (iv) that the value of the property was $5,000 or more.

*United States v. Kwan*, 2003 WL 22973515, at *3 (S.D.N.Y. Dec. 17, 2003). Defendant challenges the Estate's ownership of the funds as a matter of fact and law and the sufficiency of the evidence that the Estate's funds were "stolen" and that she knew they were "stolen."

The court has previously concluded that the government presented sufficient evidence to prove beyond a reasonable doubt that the Estate "owned" the funds in the Estate's account. The term "stolen" is not limited to larceny but "includes all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *United States v. Turley*, 352 U.S. 407, 417 (1957); *Long Cove Seafood*, 582 F.2d at 163 ("[T]he Court was making it clear that the definition of 'stolen' was sufficiently broad to abolish the

archaic distinctions between larceny by trespass, larceny by trick, embezzlement and obtaining property by false pretenses.").

At trial, the government presented evidence that Defendant represented to the Probate Court that the Rupert House was the sole asset of the Estate and its sale would benefit the Estate. Defendant received proceeds of the sale of the Rupert House as the Estate's "executor" (in actuality as its administrator) and she deposited those proceeds in the Estate account as she was required to do so. Thereafter, she took money from the Estate account without notice to or permission from the Probate Court. She did so by forging her brother's name to withdrawal slips without his notice or consent. She also did so without first paying the Estate's creditors to whom the Estate owed uncontested monetary obligations. In the light most favorable to the verdict, these facts were sufficient to establish beyond a reasonable doubt that Defendant "stole" the funds in question because she acted "with intent to deprive the [Estate] of the rights and benefits of ownership[.]" *Turley*, 352 U.S. at 417. Whether Defendant knew that the funds were "stolen" was a credibility determination for the jury which resolved that question in the government's favor. In adjudicating Defendant's motion, this court must "credit[] all inferences and credibility assessments that the jury might have drawn in favor of the government" "and view[] the evidence as a whole rather than piecemeal[.]" *United States v. Aulicino*, 44 F.3d 1102, 1114 (2d Cir. 1995). In this case, the jury's verdict was supported by ample evidence.

Defendant's request for a judgment of acquittal with regard to Count II on the grounds that the evidence was insufficient as a matter of fact and law that the funds in question were "stolen" and that she knew that they were "stolen" is DENIED.

## E.    Sufficiency of the Evidence of Wire Fraud (Count III).

The jury found Defendant guilty of wire fraud in violation of 18 U.S.C. § 1343 which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in

14

interstate or foreign commerce, any writings, signs, signals, pictures, or
sounds for the purpose of executing such scheme or artifice, shall be fined
under this title or imprisoned not more than 20 years, or both.

"The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks omitted). "As to the first element, the government was required to prove (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations[.]" *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations omitted).

In this case, the government presented evidence that Defendant committed wire fraud by accessing the Estate account in Vermont by forging her brother's name on withdrawal slips in New York. Defendant then transferred the funds to her personal TD Bank account in New York and thereafter used electronic transfers from her personal account to use Estate funds to pay vendors in Vermont. The court has previously addressed Defendant's challenges to the ownership of funds and whether the funds were "stolen." Defendant's only remaining challenge is to the sufficiency of the evidence that she had a specific intent to defraud.

"To sustain a conviction for wire fraud under 18 U.S.C. § 1343 . . . the government must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007). "[G]ood faith constitutes a complete defense to charges of wire fraud." *United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006). However, "direct proof of defendant's fraudulent intent is not necessary." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).

Defendant cites her own testimony and a Family Court affidavit that she filed wherein she admitted that she was living off her inheritance as evidence that she spent the Estate's funds openly and had no specific intent to defraud the Estate. She also called a

15

relative to testify to the fact that although she was irresponsible, she was kind hearted and well-intentioned. She testified in some detail regarding the lawsuit she sought to file against the residential care facility where her mother had spent her last days and her belief that she could pay all of the Estate's creditors from the proceeds of the lawsuit. The jury heard this evidence and considered it thoroughly as evidenced by a question they asked during deliberations regarding whether financial irresponsibility was sufficient to find Defendant guilty. *See* Doc. 75 at 118:23-118:25 ("'Judge Reiss, if we agreed that Patricia was irresponsible, does that mean she is not guilty of Count 1?'"). With counsel's consent, the court directed the jury back to the court's instructions regarding the requisite intent. There is thus little doubt that the jury fully considered Defendant's evidence of her intent before rejecting it. *See United States v. Alvarez,* 731 F.3d 1101, 1105 (10th Cir. 2013) *cert. denied,* 134 S. Ct. 1333 (2014) ("[T]he element of intent [is] ordinarily understood to be a quintessential factual question[.]") (internal quotation marks omitted).

As the government points out, there was considerable countervailing evidence that discredited Defendant's version of the events and supported the jury's conclusion that Defendant possessed the requisite specific intent to defraud. In addition to evidence that Defendant knew that the Estate owned the Rupert House proceeds and evidence that those proceeds were then "stolen," there was evidence that Defendant intended to deceive her brother when she forged his signature on the withdrawal slips. At trial, her counsel asked her: "How about when you were signing your brother's name on accommodation withdrawal slips, did you think you were deceiving Christopher McGuigan?" (Doc. 72 at 75:14-75:16.) Defendant responded: "Yes, I guess. Yes." *Id.* at 75:17.

Moreover, although it was undisputed that when Defendant used the TD Bank drive-up teller in Granville, New York she was alone in her car and thus only she could have signed the withdrawal slips provided to her, Defendant did not deny that she forged her brother's name in order to induce the TD Bank representatives to give her money from the Estate account. This was sufficient evidence to support a conclusion that through those forgeries, she intended to deceive TD Bank.

16

The evidence further revealed that Defendant depleted the Estate account substantially in excess of the deal she had struck with her brother to "keep it even" without his knowledge or consent. (Doc. 71 at 79:16-79:17.) From this evidence, the jury could have reasonably concluded that, contrary to her protestations, Defendant was willing to engage in repeated fraud and deceit if it provided her access to the Estate's funds. *See Guadagna*, 183 F.3d at 130 ("[A] jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated.").

Finally, Defendant had access to attorneys in the course of her administration of the Estate and was provided written guidance regarding her duties and responsibilities by the Probate Court. She presented no evidence that she sought any advice regarding whether she could forge her brother's name in order to expend Estate funds or expend Estate funds before paying the Estate's creditors. After Defendant was advised that the attorney she had consulted regarding a potential lawsuit against the residential care facility would not take the case, Defendant continued to spend the Estate's funds thereby negating any claim that she reasonably believed that the lawsuit proceeds would pay the Estate's creditors.

Against this backdrop, the jury was free to disbelieve Defendant's testimony that she lacked the requisite specific intent to defraud and to find, instead, that the government had established the requisite intent beyond a reasonable doubt. "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, [i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. McCourty*, 562 F.3d 458, 475-76 (2d Cir. 2009) (internal quotation marks omitted). No exceptional circumstances exist in this case. The court therefore DENIES Defendant's motion for a judgment of acquittal and for a new trial with regard to Count III.

### F.    Sufficiency of the Evidence of Uttering a Forged Security (Count IV).

The jury found Defendant guilty of uttering a forged security under 18 U.S.C.

§ 513, which provides:

> Whoever makes, utters or possesses a counterfeited security of a State or a
> political subdivision thereof or of an organization, or whoever makes, utters
> or possesses a forged security of a State or political subdivision thereof or
> of an organization, with intent to deceive another person, organization, or
> government shall be fined under this title or imprisoned for not more than
> ten years, or both.

*See United States v. Reasor*, 418 F.3d 466, 468 (5th Cir. 2005) ("It is a federal crime

under 18 U.S.C. § 513(a) to (1) make, utter or possess (2) a counterfeit security (3) of an

organization (4) with intent to deceive (5) another person, organization, or

government.").

Defendant argues that the withdrawal slips on which she forged her brother's

signature do not, as a matter of law, fall within the definition of a "security" and therefore

she should be granted a judgment of acquittal.  The government counters that the

definition of "security" is sufficiently broad that it encompasses the withdrawal slips at

issue which served as a de facto check and that there would be little purpose in

criminalizing the use of forged "drafts" and "checks" but permitting a forged withdrawal

slip that served the same purpose.

Under 18 U.S.C. § 513(c)(3),

the term "security" means—

> (A) a note, stock certificate, treasury stock certificate, bond, treasury
> bond, debenture, certificate of deposit, interest coupon, bill, check,
> draft, warrant, debit instrument as defined in section 916(c) of the
> Electronic Fund Transfer Act, money order, traveler's check, letter
> of credit, warehouse receipt, negotiable bill of lading, evidence of
> indebtedness, certificate of interest in or participation in any profit-
> sharing agreement, collateral-trust certificate, pre-reorganization
> certificate of subscription, transferable share, investment contract,
> voting trust certificate, or certificate of interest in tangible or
> intangible property;

(B) an instrument evidencing ownership of goods, wares, or merchandise;

(C) any other written instrument commonly known as a security;

(D) a certificate of interest in, certificate of participation in, certificate for, receipt for, or warrant or option or other right to subscribe to or purchase, any of the foregoing; or

(E) a blank form of any of the foregoing[.]

Defendant argues that Section 513(c) reflects a congressional intent to limit the crime to the specified items which Defendant contends all have intrinsic value, reflect ownership in property, and can serve as collateral. She asserts that, in accordance with the ordinary definition of "security,"[4] the withdrawal slips are not the equivalent of either "drafts" or "checks." She cites the Uniform Commercial Code's definition of a draft as an order to pay money and a "check" as a draft that is payable on demand and drawn on a bank. She asserts that, because they do not qualify as negotiable instruments, the withdrawals slips at issue are not commercial paper and thus not "securities." Defendant was permitted to make this argument to the jury which apparently rejected it.

The Second Circuit has observed that "[t]he legislative history of section 513 reveals that Congress promulgated so expansive a definition because it wished to criminalize the counterfeiting of instruments capable of serving as collateral for loans and other illegal purposes." *United States v. Dos Reis*, 113 F.3d 1230 (2d Cir. 1997) (unpublished table decision) (internal quotation marks omitted). It has further held that "[i]n the generally accepted commercial sense, securities are defined as instruments giving to their legal holders rights to money or other property." *United States v. Canton*, 470 F.2d 861, 864 (2d Cir. 1972) (internal quotation marks omitted). The few cases that

---

[4] Defendant cites Black's Law Dictionary which defines security as: "An instrument that evidences the holder's ownership rights in a firm (e.g., a stock), the holder's creditor relationship with a firm or government (e.g., a bond), or the holder's other rights (e.g., an option)." *Security*, Black's Law Dictionary (10th ed. 2014).

have addressed whether a withdrawal slip is a "check" have reached divergent conclusions based on statutes that are not at issue here.[5]

In determining the meaning of "securities," the court examines the language of the statute itself, the specific context in which it is used, and the broader context of the statute as a whole and as part of a statutory scheme. *See United States v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012) ("'In interpreting the statute at issue, we consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme.'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341). The list of covered "securities" set forth in section 513 is broad and transcends the common definition of "securities" to include items such as bills of lading, money orders, interest coupons, and warehouse receipts. The list reflects few commonalities other than including virtually every means of accessing or evidencing money or property rights. Contrary to Defendant's assertions, section 513(c) does not require the "security" to be negotiable, it does not require it to have "intrinsic value," and it does not require it to be usable as collateral as even blank forms of the identified items are included.

By the sheer breadth of the items included in section 513(c), it is evident that Congress intended to prevent fraud and the use of forgeries in interstate commercial transactions almost regardless of the specific type of instrument, paper, or document used to accomplish the unlawful act. In this respect, the Eighth Circuit's interpretation of the term "security" as set forth in the National Stolen Property Act, 18 U.S.C. § 2311, is instructive.

In *United States v. Speidel*, 562 F.2d 1129, 1131 (8th Cir. 1977), the Eighth Circuit considered a similarly broad list of covered items and concluded that "it is apparent that the definition of securities is intended to be expansive." The court rejected the defendants' arguments that a "security" should be limited to "documents valuable in

---

[5] *Compare People v. Mares*, 66 Cal. Rptr. 3d 580, 585 (Cal. Ct. App. 2007), *as modified* (Oct. 5, 2007), *as modified on denial of reh'g* (Oct. 25, 2007) ("[T]he withdrawal slip filled out by the teller at defendant's request was a completed check[.]"), *with United States v. Greene*, 43 C.M.R. 737, 739 (A.C.M.R. 1971) (holding a withdrawal slip "is clearly not a 'check' or 'draft' under any accepted definition of the terms.").

themselves" or to "documents normally considered securities by the commercial and financial community" because the court did not "believe that Congress intended or the law requires the restrictive reading urged by defendants." *Id.* Although "quitclaim deeds" were not among the many items specifically covered by the statute, the Eighth Circuit nonetheless concluded that they were "securities." In doing so, it rejected the notion that the rule of lenity dictated a contrary conclusion:

> While criminal statutes traditionally are construed strictly, the salutary purposes of preventing fraud and the use of forged documents and instruments in perpetrating frauds are also entitled to consideration. As expressed in *U.S. v. Turley*, 352 U.S. 407 (1957), it is appropriate to consider the purpose of the act under review and to ascribe a meaning to its words consistent with the context in which they appear. The rule of strict construction of criminal statutes does not mean that every criminal statute should be given the narrowest possible meaning, in derogation of the legislative purpose.

*Id.* at 1132.

The reasoning of the *Speidel* court applies with equal force here. At trial, the government introduced evidence that TD Bank representatives permitted Defendant to use withdrawal slips in the same manner as a check in order to obtain money from the Estate account. There would be scant logic in a statutory interpretation of "security" that prohibited a forgery in conjunction with an *actual check*, but permitted it if the forgery only pertained to something *used as a check*. Both represent demands for money that are honored by a bank.

Moreover, Defendant can claim no lack of notice or unfair surprise that her practice of forging her brother's signature on withdrawal slips was prohibited. Indeed, she makes no such claim. As the Eighth Circuit observed in *Speidel*:

> Strict construction of criminal statutes is based on the need to provide fair warning of what conduct is criminal and to insure that the legislature rather than the courts define criminal behavior. Certainly, no one should be surprised that the transportation with fraudulent intent of forged quitclaim deeds could be proscribed. The pervasive and broad-ranging definition of securities set forth in [§] 2311 demonstrates a Congressional intent to cover almost all forms and types of stolen or forged certificates representing intangible or tangible property interests.

21

*Id.* at 1131, n.4 (citations omitted).

The Second Circuit has observed that section 513(c) reflects "so expansive a definition" of "securities" because "Congress . . . wished to criminalize the counterfeiting of instruments capable of serving . . . other illegal purposes." *Dos Reis*, 113 F.3d 1230 (internal quotation marks omitted). This legislative purpose is furthered by treating the withdrawal slips as "securities" because they constituted a demand for money that was used for illegal purposes. The court was therefore not required to instruct the jury that, as a matter of law, a withdrawal slip could not be a "security" under section 513(c).

Because there was sufficient evidence to support the jury's conclusion that Defendant committed wire fraud as charged in Count IV, Defendant's motion for a judgment of acquittal with regard to that count is DENIED.

### G.    Whether a New Trial is Required to Prevent Manifest Injustice.

Defendant seeks a new trial on the ground that it would constitute manifest injustice to allow the jury's guilty verdicts to stand. She argues that there was significant evidence she did not intend to defraud the Estate, that she did not know the extent of the State of Vermont's claim for Medicaid reimbursement because she was unaware of her brother's theft of their mother's Social Security checks, and that, at the time of the offenses, she was confronting numerous challenges in her personal life.

> On a Federal Rule of Criminal Procedure 33 motion for a new trial, the court may grant the motion if the interest of justice so requires. In deciding a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice.

*United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) *cert. denied*, 135 S. Ct. 400 (2014) *reh'g denied*, 135 S. Ct. 886 (2014) (citation and internal quotation marks omitted).

"The defendant bears the burden of proving that [she] is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."

*McCourty*, 562 F.3d at 475 (internal quotation marks omitted). Although the "court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

Defendant's arguments in support of a new trial generally track her arguments in support of a judgment of acquittal which the court has previously addressed and rejected. Defendant's additional argument that she did not know the extent of the claim by the State of Vermont was not supported by the evidence at trial which demonstrated that the claim was filed with the Probate Court and twice sent to Defendant. If Defendant was not aware of its full extent, it was because she never inquired. The jury was free to consider this as evidence that Defendant never intended to pay it. Similarly, even if Defendant did not initially know that her brother had stolen their mother's Social Security checks, she was presented with conclusive evidence of this fact and continued to expend the Estate's funds thereafter.

While Defendant's mitigating circumstances may be relevant at sentencing, they fall short of establishing a real concern that an innocent person has been convicted and this case does not represent the "most extraordinary circumstances" that warrant a new trial. *Id.* Because Defendant has failed to establish that "manifest injustice" will result if the jury's guilty verdicts stand, *Aguiar*, 737 F.3d at 264, Defendant's motion for a new trial under Fed. R. Crim. P. 33 is DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion for a judgment of acquittal and DENIES Defendant's motion for a new trial (Doc. 81).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 21st day of May, 2015.

Christina Reiss, Chief Judge
United States District Court

23